al. All right, we'll call now case 18-20405, PPD Enterprises v. Stryker Corporation. Mr. Carty. Good morning. May it please the Court, my name is Rob Carty. I represent the appellants and cross-appellees in this case. Joining me at counsel's table is my colleague Jesse Coleman. I respectfully reserve five minutes for rebuttal. As the Court knows by reading the briefs, there are many reasons why the appellants seek reversal in this case. The primary reason is that we think we are entitled to a judgment as a matter of law. The main reason there being that we believe that PPD committed material and incurable breaches of the contract before we terminate it and that we were therefore entitled to terminate. The alternative reason is that once the case did go to the jury, the District Court allowed Teresa Ford to testify to some things that allowed the jury to ignore the expressed terms of the contract. And then if there is no reversal, we have some other arguments about recalculating the pre-judgment interest award and assessing costs. Today, I'd like to go through just a couple of these issues that we think are kind of the cleanest, easiest to prove arguments. And the first one is for the JMOL. And for the JMOL, we've got four different breaches that we talk about in the briefing. There are two in particular that I'd like to focus on because I think they're particularly clear. And both of them have to do with unauthorized disclosures of confidential information. And the first of those two instances involves Angie Domain. And by the way, when the Court goes through the briefs, you will see a name that appears to be Angie Dominguez, but my understanding is that the preferred pronunciation is Domain. So Angie Domain is the principal of PPD. When she signed the contract with MAKO, she essentially ended up serving two masters. One was MAKO and one was MAKO's direct competitor, a company called Corin. At some point, the Corin sales decreased and Corin began to ask questions. They became dissatisfied and they demanded an explanation of why these numbers were so low. And Ms. Domain gave them that explanation. Unfortunately, when she did, she disclosed some information concerning procedure volumes, which in the contract is expressly defined as something that is confidential and whose disclosure expressly constituted a material and incurable breach that entitled MAKO to terminate the contract immediately. And this is all in writing. So Corin asked Ms. Domain for an explanation and she told them in one of her monthly reports in October, excuse me, in August of 2014, that a confidential study that MAKO was undergoing called the TKA, Total Knee Arthroplasty Study, would be resuming that month and that the volume of procedures for that month would be about eight to nine cases. Now again, procedure volumes are expressly defined in the contract as something that PPD was not allowed to disclose to anyone, let alone a direct competitor like Corin. And that's in, you'll find that in section 4.14I of the contract. Ms. Domain agreed at trial that this did in fact constitute procedure volumes. And it is again, undisputed that it was confidential and that it was in fact disclosed to a competitor. The second disclosure. On that point, what is the result in the case overall? The result of the case overall means that PPD committed a material incurable breach which expressly entitled MAKO to immediately terminate the contract without notice. So that ends the case. That ends the case. The second of these disclosures involved a PPD sales associate named Mark Ortman. Now Mark, by way of background, MAKO had a relationship with a doctor named Dr. Kreutzer. And Dr. Kreutzer, his performance was not meeting with MAKO's and Stryker's approval. And so they concocted a strategy, MAKO and Stryker concocted a strategy to find other people with whom to partner and other doctors to replace Dr. Kreutzer. Now as you can imagine, this is a very sensitive issue. And it's a strategic issue. It has to do with business strategy. Again, this is exactly the kind of information that the contract in section 4.14i expressly identifies as confidential and never to be disclosed. Dr. MAKO and Stryker representatives met with Mr. Ortman and Ms. Domain and informed them of what the strategy was going to be to phase Dr. Kreutzer out and phase new doctors in. After that, Dr. Kreutzer reached out in writing to Mr. Ortman, and this is in Defendant's Exhibit 92, and he asks for a list of points from that meeting. And he says in the email, he says, this will stay between you and me. So Mr. Ortman said also in writing in the same email chain, I will formulate a list tonight and converse with Angie, Ms. Domain, tomorrow to ensure I'm not forgetting anything. When he was, when he gave his testimony at trial, Mr. Ortman admitted that he followed through and gave this information to Dr. Kreutzer, and he also admitted that it was a constituted business strategy information. So again, this is a second disclosure of expressly confidential information. The contract expressly declares it an incurable and material breach, and the contract expressly allows MAKO to terminate the contract. That they concede occurred, that the opposite, that the, that they concede occurred, these events that you're talking about, or the divulgence that you're talking about, they admit. That's correct, at trial. So just for that purpose, and of course, this is not to take away from any of the other points that we make in our brief, we think that they're all meritorious, and we think that they all entitle us to a judgment as a matter of law. Let me ask you, what were the grounds? You've outlined two breaches in particular, but you previously mentioned that you believe there were four. What were the grounds or the reasons provided in that October 2014 notice of termination? Were any of these issues highlighted as pertinent? They were not, Your Honor, and here's why. The company did not find out about them until the litigation is sued. It's, I should point out here that the agreement, when we're talking about material, these material incurable breaches that entitle the company to summarily terminate the contract, the notice provision doesn't require anything in particular. Okay, so there's no stated reason in the notice at all? These four breaches or any other reason? Yes, and in fact, it did. There were a couple of things that the company knew about, which we go into in the brief, but one of them was Mr. Ortman, again, the PPD sales representative, had antagonized the operating room staff at Herman Memorial Hospital in the Woodlands, Texas, so much so that they sent an email to MAKO saying that they wanted to revoke his privileges. They wanted to basically debar him from the facility. But that was all presented to the jury, wasn't it? It was. And I assume the email itself was an exhibit presented at trial. I believe that's true, yes, sir. And then the other one that was mentioned in the notice was, I want to say, my memory is failing me here, but I believe it had to do with a failure to promote MAKO products. But be that as it may, some of these, the two breaches that I've mentioned today, came to light during litigation. In fact, the disclosure to Corrin concerning these procedure volumes, which by the way, really are, they really are a secret. Those, we didn't get that information from PPD. We had to subpoena those reports from Corrin, and that's how we found out about those. With regard to our argument for a new trial, all of that revolves around the testimony of Teresa Ford. We have a contract here that everybody agreed was unambiguous. It has a merger clause. And given that, we believe that it was absolutely inappropriate for Ms. Ford to give parole evidence concerning things that were said during negotiations, previous drafts of the contract, what she believed people meant when they said that PPD could not promote off-label uses and that sort of thing, and the standard use of the term off-label in the industry. We believe that none of that should have come in. A lot of it was hearsay. All of it was parole evidence. And under Florida law, which governs the contract, it should never have come in. But even worse than that, Ms. Ford was allowed to testify about the law as a legal expert. She was never designated as an expert, but when she took the stand, she started talking about things like the FDA's definition of off-label. And again, I should ... What opinions specifically ... I understand your grievance here on appeal is that there's expert testimony that wasn't designated prior to trial as it properly should have been, and the opinions and the basis for them was not disclosed, and of course, the purpose being that you would want to call an expert to countervail that testimony. So what specific opinions ... You mentioned an FDA, some FDA testimony. What specific opinions from her testimony do you think are outside of the scope of her lay witness testimony? I understand your other issue with her testimony is that it's an unambiguous contract, but when we talk about whether or not she testified as an undisclosed expert, we're talking about opinions that were offered that were not previously disclosed. That's what my question is. Right. And let me just preface my answer by saying that to the extent these were legal opinions, they should have never come in under any circumstances. But to answer your question, Your Honor, she testified about what she believed the FDA definition of off-label use was. Now, the reason ... And it has to do with approvals and other things that come from FDA regulations. And the reason that we have a problem with it is because right there in the contract, it says what an off-label use is. It's contractually defined. So that's number one. Number two, she talked about the learned intermediary doctrine and made quite a point about how she's true. Doctors are perfectly allowed to prescribe whatever they want, even if it's not on-label. And that's true, but it's ultimately irrelevant here because we defined what the term is. Another thing that she testified to was she testified that this definitions document that I've referred to, she testified that it wasn't ... Well, initially she testified it was part of the contract. And then she switched back and said, no, it's not part of the contract. So these are things that allowed ... It gave the jury a hook to just ignore, override what the contract said. And so that's our main grievance. We've also got some points on the cross-appeal. I don't know how much I'll be able to say before my time runs out, but let me just sort of say this up front and I'll talk about more, I think, on rebuttal. The whole core theme of the cross-appeal here is based on an inaccurate premise. And that inaccurate premise is this notion that Stryker somehow failed in its burden on summary judgment. I don't necessarily even understand the argument, but what I can say is this. On summary judgment, Stryker came out and said, PPD has identified all of these statutes that it believes support a tortious interference claim, but none of them are ... None of them can support such a claim as a matter of law. Then we took some very, very limited evidence that PPD had produced in discovery and a briefing and dissected it. I don't know how that is not meeting our initial burden on summary judgment. We made our case and ultimately it prevailed. Thank you. One question before you sit down so that way your opponent, if necessary, can respond. What case do you rely on to support your contention that under 54D there could be a designation of multiple prevailing parties in the case? And in this case in particular where we're talking about subsidiaries and related parties, is there a case that we can go look at that supports that proposition? We didn't find any. I'm not saying it's not out there, but we didn't find any. This is ... We're just reading Rule 54D and there is no question that these particular parties were prevailing parties. Okay. Thank you. Ms. Hallmark. Good morning. May it please the Court, my name is Jessica Hallmark and I have the privilege of representing PPD Enterprises, whose principal, sole principal, is Angie Domey. Your Honor, I'd like to ... I had planned out my whole argument, but in light of counsel's argument I'd like to address a few issues. First of all, I think it's extremely important for the Court to understand the background surrounding this contract. PPD Enterprises is a distributor of medical devices and implants. They distribute for Corrin, they distributed for Mako, and they distribute for other vendors. What's important to note about this contract is at the time that it was entered into between PPD and Mako, Mako was a sole separate entity. Stryker Orthopedics acquired that entity months after, so I think the contract started in June and in October Stryker acquired that. Stryker and Corrin most certainly are competitors, but Corrin and Mako were not competitors. In fact, the evidence before the jury that's in the record before this Court will show you that Corrin was actually providing its implants to Mako, and then Mako would take those implants, put a sleeve around it, and sell it as a Mako implant. So throughout the record you'll see where it talks about non-Mako branded Corrin implants, Mako branded Corrin implants. I think it's important that the Court understands that from the get-go. In connection to Judge Engelhardt's questions regarding the termination, Stryker clearly did not like the fact that PPD had this contract, and they did not like the fact that she was selling Corrin. So on May 5th, in the record you'll see there's an email on May 5th where Paul Helcher, who is the regional manager for Stryker, and Adam Jacobs, who's the branch manager, they're asked them to find basically any reason to terminate this agreement. That was on May 5th. And then these, you'll see, you could see in the emails, and the jury saw it. That's why they found the way they did. The evidence was before them. They could see that these reasons for terminations were basically just a concocted scheme to get out of the contract early. In connection to the termination letter, the first one didn't list any reasons whatsoever. Ms. Domain had another counsel at that time prior to me. She sent a letter and said, tell me the reasons. They set forth two reasons. One was the alleged cussing incident, which, mind you, here's something that's particularly important to know about the cussing event. This alleged incident happened in April of 2014. No one spoke to PPD about it. No one from the hospital, no one from Stryker, no one from MAKO, no one. The first time that PPD found out anything about this alleged incident was after termination of the contract when they said, why are you doing this? So if it was so bad, why didn't the hospital come to PPD? And the testimony from the hospital, from Ms. Kelly, specifically said it didn't reflect poorly upon PPD, I mean, it didn't reflect poorly upon MAKO, it reflected poorly upon PPD. Additionally, the other reason that was listed in the letter was this failure to report, which they didn't even talk about. And the reason why they didn't talk about it is because there's plenty of evidence to support this finding that that was a bogus excuse, and you can see throughout the record that they were basically, that was a concocted scheme to try to see if they could set her up. But everybody testified she always provided all the information that was requested. I want to talk about the confidentiality, but I need to address something immediately. And I guess it relates to the confidentiality. But I want this court to know that the first time that myself as a lawyer, who's been handling this case now for almost four years, has ever heard that the conversation between Paul Helscher, Angie Domain, and Mark Ortman that took place in April of 2014, let me tell, I know the court knows who Paul Helscher is, that was the striker manager, Angie Domain is our principal, Mark Ortman is her sole employee. In April 2014, after striker took over the contract, Paul Helscher set up a meeting with them. Paul Helscher testified that that meeting was basically a, hey, let's get to know each other meeting. His testimony is in the record at 8848-8849. He says, it was just a, hey, let's come together, let's figure out how this is going to work. Angie Domain's recollection of that meeting, however, was a bit different. Hers was, Paul Helscher telling her, I don't like the fact that you sell corn, you're on an island by yourself, I won't do anything to put a dime in your pocket. That's her recollection of the meeting. However, there is nowhere in the record before this court, and again, the first time I've ever heard a story about, they had this conversation about how they were going to replace Dr. Kreutzer, and how they were unsatisfied with him. That is not in the evidence before this court, it has never come out as evidence, and I don't know where counsel gets any support for that position, because that has never been asserted. Moreover, the testimony on that issue from Mr. Ortman was, yeah, we talked about some stuff about Dr. Kreutzer, that's the extent of his testimony. Dr. Kreutzer's testimony on the issue is that there were no business discussions. Again, Ms. Domain's testimony is, it was just basically very uncomfortable, and he was telling me how much he didn't like my business. And Paul Helscher was, it was just a, hey, let's get to know each other. So as far as whether or not it's confidential, most certainly it wasn't, and moreover, remember this, the question to the jury, and this, the pointed contested issue of fact in the pretrial order was, did they have a legitimate basis to terminate the sales representative agreement on October 15th, 2014? They just said, as of that time, they didn't even know about that, but they knew about that meeting. Moreover, in the contractor honor, which is most important, it specifically provides that certain information is not confidential, and most certainly as far as . . . Before we get to that, counsel said that, indicated, as I understood his argument, that it was understood, maybe even expressly stated by all parties prior to trial, that the contract was unambiguous. Is that a correct statement? That is correct. Okay. So, some, January 19th, 2018, some, maybe, what, 12 days before trial, there's a witness list filed with Ms. Ford's name and a description of her testimony. What would be the purpose of her testimony over and above the unambiguous contract? In other words, what did she add to the presentation in the order of proof that would go on top of an unambiguous contract? Well, okay, so here's what she did add. There's a couple of things that she added. One thing is, is that she could talk about the off-label contentions. What's important for this Court to understand is, is that on December 6th, 2017, not long before trial started, is when the defendants first produced this supposed bulletin that supposedly defined the term off-label. This bulletin was never attached to the contract. It was, and nowhere in this agreement does it reference that, that specific document. Now, in the end, in the back, where it lists training materials, it does talk, it lists . . . That's the only reference to the bulletin in the contract. That is the only reference. Training materials? Yes, Your Honor. And so when they did that, it took us aback a little bit, because remember, this whole off-label ruse deals with whether or not PPD utilized commercially reasonable efforts. It's not whether or not PPD promoted off-label. The issue to the jury was, did PPD utilize commercially reasonable efforts in their sale? So it's really a peripheral issue. However, we knew it would be a confusing one to the jury, because even as a lawyer, it was confusing to me. So we designated Ms. Ford. She had already been previously designated as a witness with material fact, because clearly she negotiated the contract. But I also added at that time, once I got that bulletin, that, hey, she's going to address those off-label contentions. Now notably, she's not the only person who addressed those issues, or talked about the definitions by the FDA. Not only did Mr. Jacobs talk about that, but Ms. Domain addressed that, as did Dr. Kreutzer. So really, any alleged harm from her is frankly harmless, because, and you heard him say, she was right. I mean, the learned intermediary doctrine, where Dr. Kreutzer discussed that. You heard him say she was right, and Dr. Kreutzer actually addressed that issue too, which is, and so did Dr. Friedhand. And that is, as the doctor, they get to choose what product they want for their patients. Whether it's off-label or on-label, it's what's in the best interest of their patients. To your question, Judge Engelhardt, because I think I sidetracked a bit, and I apologize. As to the contract itself, it is not a violation of parole evidence rule, so long as it doesn't vary or contradict. There were emails between Ms. Ford and Melissa Villavesas, who was MAKO's attorney. By the way, Ms. Villavesas was listed as a witness for MAKO. They never called her, even in light of Ms. Ford's testimony. They never called her. But there were emails between them. Specifically, there is a prior draft of the agreement, and it is located at 10407 to 10464, 10466 to 10524. In that prior version, it said specifically that PPD could not utilize or sell other implants, meaning PPD would have been prevented from selling any Corrin implants that were non-MAKO-branded. That provision was deleted. It was deleted so that Ms. Domingue could continue to provide her Corrin implants, which is exactly what the contract says. Nothing in this contract, as is, prevents or prohibits her from selling non-MAKO Corrin-branded implants. And that email basically shows, hey, here's the provision that would have prevented you from doing that. It came out. It's gone. And moreover, there's a subsequent email where Ms. Villavesas says, here, Mr. Campbell, he's a MAKO guy, here, Mr. Campbell, here's the current draft showing where you accepted these changes. Everyone knew Ms. Domingue PPD was going to sell Corrin implants. That's why MAKO wanted her. And in fact, it makes sense, right? Because MAKO's getting ready to sell. They don't really want to keep buying Corrin implants. So they're just going to get someone who already sells those implants, knowing that Stryker's about to acquire them. It makes sense. But the bottom line is this, none of Ms. Ford's testimony varied or contradicted the terms of the agreement. As to this— Was Ms. Ford a disclosed expert witness? No, sir. She was not. She was a disclosed fact witness. And in Downey v. Bob's Discount Furniture, which I've cited to in my brief, the court is clear that there's no report required if she is a part of ongoing sequence of events and personally involved before the commencement of the suit. What we did do is we had her listed as a fact witness that she was counsel for PPD who negotiated the contract. In our expert disclosures, we did reserve the right to elicit expert testimony for many fact witnesses who had—who were involved in the ongoing sequence of events. But the bottom line— Is your point that she never strayed from being a fact witness or that it was greater— Exactly. Exactly. And that's what Judge Smith—yes, sir, it is. That she never provided expert testimony. Right. And if she did, if you would say that her, you know, opinions as to the term off-label or to learn in a mediary were expert, it was—any prejudicial effect or harmful effect was nil because Dr. Kreutzer testified about the same thing as did Ms. Domain. Moreover, MAKO didn't do anything to combat that. They had Melissa Villavesas listed as a witness. They didn't call her. They did nothing to try to alleviate any potential harm, and they had every opportunity to do so. So, moreover— Well, you say that she wasn't called as an expert witness, but I believe in the transcript and the closing argument, it's argued that we had one lawyer that specialized in this So it sounds like when you're arguing that the witness specialized in the area, you're relying on specialized knowledge. Is that—does that concern you that the witness may have—I understand your argument that it's harmless, but it seems like we're a little past the point of her being purely a fact witness if we're arguing to the jury that she has specialized knowledge that the jury should appreciate in that vein. To that point, Judge Engelhardt, one, I didn't do that. I didn't do the closing. Okay. Well, but that's what the record says. So— No. Yes, sir. I understand. But what's notable about that record is they did not object at the time that that statement was made. There was no objection from MAKO at the time that that statement was made. Moreover, MAKO did not request any curative instruction be had to the jury at that time. Well, but they had already objected during her testimony that it was expert testimony. Isn't that true? Or am I misreading? I have a copy of the transcript— Your Honor, I believe— I have her testimony as well. I mean, I think they've already lodged that objection on the record while she's on the stand. Look, she's testifying as an expert improperly as an undisclosed expert. So I'm not so sure that during closing argument it's incumbent upon them to stand up and object and make an objection that they've already made. Well, but I think at that point in time—I mean, I don't think—I think at that point in time if they're saying—because remember, the standard of review is the prejudicial effect, and I think they can't just sit back. Moreover, I think in closing you do, at least I know in Texas, you have to object at the time that there's error supposedly happening in your closing, and you have to request an instruction at that point to the jury, or it's waived. I can't say for certain that that's the law in the Fifth Circuit right now said certain, but I most certainly can't imagine that it would be different. As the judge pointed out, though, Judge Smith, when he was ruling about the expert testimony, you have to remember all this off-label stuff came in on December 6, 2017. That was about a month before trials started. We were well past expert disclosures, and so you have to remember this off-label was dropped a bit as a bomb on PPD, and we were having to deal with it, and we did. But the bottom line is, is everything that Ms. Ford testified to was based on her knowledge as a lawyer. It was what she thought, what she believed. It wasn't that, hey, I'm a lawyer, and for sure this is said certain the way it's supposed to be, but also MAKO did nothing to try to quash that or distinguish or rebut that testimony. Here's the most important thing, though. Ms. Ford's testimony was right. They're not saying it wasn't right. They're not saying it wasn't true. He even said it was true, and there were other witnesses who testified to the validity of the testimony that she offered. Moving back to the confidential argument, I know we talked about the Mark Ortman, but we also, there was another confidential information argument that they raised, which was as to the TKA implants. The contract itself specifically sets forth what is excluded as confidential information. That is, information that is in the public realm and information that can be disclosed by a third party. Ms. Domain testified as to Dr. Kreutzer, who was the head of the study, that one, the number of cases, the volume of cases in that study was public knowledge. Two, she, Ms. Domain and Dr. Kreutzer both testified that the volume of cases that were happening at that time, that information came from Dr. Kreutzer, and Dr. Kreutzer could not get to her. Based on the contract, there was nothing precluding her. It was not confidential information that was given. All she says is, hey, listen guys, my TKAs are going to go down because Dr. Kreutzer has eight or nine cases for the TKA, which is information that Dr. Kreutzer gave to her. Frankly out of time, there's a lot to talk about. I hate that we could not get to my cross-appeal, but I will say this. They did not meet their burden. The easiest place to look to see whether or not they did is Judge Smith's orders. They raised those statutes and said, hey, these statutes cannot be relied upon in satisfaction of the unlawful element of the tortious interference claim. Yeah, they addressed all the statutes there, but then they come back with a broad statement that says PPD has no evidence to support their tortious interference claim. Go ahead and take another minute. I think opposing counsel got another minute. I'm sorry, sir. Go ahead and take another minute. Oh, thank you, Judge. So, you know . . . Well, on that point, how do you reconcile that with Sturgis? I think the district, or should I say the judge who tried the case in the order cited the Sturgis opinion. Yes, sir. Is there not some narrowing of that in Sturgis, or do you read that differently? I read Sturgis differently, Judge. I think Sturgis actually is to the point to the extent that it says, hey . . . and really their distinction between a tortious interference with prospective business relations and a tortious interference with contract, they make the point and say, look, you can't complain if it's just not fair, right? But if their conduct is unlawful, then most certainly you can complain. Well, how much more unlawful do you get than violations of the anti-kickback statute or the Texas version of that, which is the Anti-Solicitation Act? Here's the other case, though, that the court should look at, I think, is the N. Ray Memorial Hermann case. Because, remember, there's really no cases that are spot on on any of these statutes. There's the reliable ambulance opinion case, which was a long time ago, but it doesn't really address it and it leaves open the question of whether or not the AKS could be relied upon in support of the tortious interference claim. It leaves it open. But the N. Ray Memorial Hermann case, in that case . . . I think we have your argument at this point. Oh, okay. I'm sorry, Judge. But that . . . We have your briefs as well. And, you know, that case was cited for that same proposition by security data supply on for the same proposition. And the one last thing I'll say, and then I will sit down, is N. Ray Memorial Hermann makes the point that this tort is really to fill the gap, where there's not another tort for this wrong. It is a gap-filler tort. Thank you. I thank the Court for the extra minute, and probably more, and just appreciate the time this morning. And if I have any other questions for me, I'd be happy to answer them. Thank you. Mr. Ciccardi, you've reserved five minutes. Thank you, Mayor. Please, the Court. One thing that I'd like to respond to . . . Oh, first of all, Judge Englehart, you had asked me about the Rule 54b thing. We actually did cite some cases in our brief. So those are in there. I don't think any of them were from the Fifth Circuit, but . . . My friend, Ms. Hallmark, said that none of the information that was disclosed was confidential. The record, however, shows pretty clearly that it was, and in fact, if we start with the contract, again, I don't want to repeat myself, but if we start with the contract, it specifically defines certain classes of information that must never be disclosed. And then if the Court looks at the actual testimony, which is cited in the brief, the Court will see immediately that Mr. Wartman and Ms. Domain, respectively, admitted that this was just that kind of information by name, verbatim. So I wanted to dispel that. Another point that I want to make, and I'm almost reluctant to get into all this detail, but my friend, Ms. Hallmark, said that the contract did not prohibit PPD from selling or promoting Corinth products. To an extent, that's true, but it is absolutely untrue when it comes to surgeries using this real robot system. The real robot system is an invention that MAKO came up with, cutting edge. It allows unparalleled precision in joint replacements. It's very advanced technology. The contract was specific that it is an off-label use to take a non-MAKO implant and use it in conjunction with a real robot hip replacement. So I just wanted to point that out. Other than that, yes, everybody knew that they were selling Corinth, but that was for other operations, not for the real. I believe my friend said that Mr. Jacobs discussed the definitions or perhaps opened the door to Ms. Ford's legal testimony, legal expert testimony. At no point did he ever try to interpret anything. The only thing that he did on the record, and we talk about this in our brief, is he read from the document. He was asked to read from the document, and that's it. He didn't interpret anything. Barring any questions from the court, I would... Why was Villaveso not, if listed as a witness, as counsel has indicated, why was that witness not called after Ms. Ford's testimony? I think that would have put us in an impossible situation. Here we were saying that this kind of thing was not admissible, was totally inappropriate. We would have risked waiver if we would have done that. Okay. Unless there are any further questions, I will take my leave. Thank you very much. Thank you. The case is submitted. We will take a short recess before hearing the third and final case of the morning.